Will your argument next in Nick's Garage be Progressive Casualty Insurance Company? Uh, 15-1426. But I also understand that Council for Nationwide will be at the table after this. Ms. Cannon? Your Honor, may I just clarify, will my rebuttal be after Nationwide has given their argument? That's fine. However you want to proceed, that's fine. That's what I'd like to do. Thank you. May it please the Court, my name is Cicely Cannon with Bousquet Holstein in Syracuse, New York. And we represent Nick's Garage, which is a collision and auto repair facility that's been in business in our community for over 60 years. And in our case, Nick's Garage is standing in the shoes of 59 consumers who took their vehicles for repairs to Nick's Garage, for which Nationwide or Progressive were obligated to pay. And the standard for both is the amount that was necessary to return the vehicle to its pre-accident condition. So, in each of these cases, Nationwide and Progressive failed to pay the proper amount. There were four components of these, and with Your Honor's indulgence, subject to any questions that you may have, I'd really like to focus on the labor rate component specifically. On the what? The labor rate component. And that's, just to clarify that, there's a reference to a labor rate and labor hours. Labor hours are basically operations. The way these estimates are set out, they list operations that are needed and then the number of hours required for that operation, add them all up at the end, multiplied by the respective labor rate. So operations and labor hours are the same thing. But here I'm focusing on labor rate. The obligation under the contract for Progressive explicitly says that they will pay the prevailing competitive rate, which needs to be reasonably determined. Now, the word competitive is very important in that. I think that you will probably hear quite a bit about the, quote, prevailing rate. But a prevailing rate does not necessarily mean that it's a competitive rate. And that, I think, is one of the first errors that was made by the district court in deciding these cases, is failing to understand that distinction. With respect to the evidence, Nationwide's obligation, although it's not as explicitly stated, it's our position that that is the same obligation under the policy there. And with respect to the third parties, where you don't have a specific insurance policy issue, again, this is the same standard that once having accepted liability on behalf of their tortfeasor, that's the standard to which they're obligated. Now, we put into evidence quite a bit of evidence with respect to whether or not this rate was competitive. And, first, we did put in estimates from other insurers showing that they paid more. And then, in addition, there was the report of Dr. Jennings, who is a Harvard and Stanford-trained economist, and who was applying a very well-accepted method of analysis that arises out of the IRS regulations. Dr. Jennings began his career working for accounting firms and looking at cross-border transactions. The IRS is concerned that companies with related entities across borders would shift income one way or the other by engaging in transactions to shift that income, and those transactions wouldn't be at the fair market rate. So the IRS developed a method by which they said, let's look and see if these transactions are a competitive fair market rate. Dr. Jennings was very familiar with that. It's well accepted. It's set forth in IRS regulations. And he simply said, you know what? I can use this same analysis to say whether the rate is competitive in this context with respect to auto repair. And the reason he's able to do this is because auto repair, as evidenced, is broken down into two segments. And this is supported both by Rocco Avelini. It's supported by all the depositions of Nationwide and Progressive's own representatives. It's really undisputed that within the industry you have mechanical repair shops and collision repair shops. That's not to say that there isn't occasionally some overlap between them. Certainly part of our point is to say collision repair shops also have to do mechanical. But by and large, when you're looking at the repair industry generally, you have shops that fall into these two categories. Can I ask you a question that you may be confused about? I thought the contractual obligation was the amount necessary to restore the vehicle to its pre-accident condition. I assume that that includes cost of labor. So why isn't the question – why are we looking into the component parts of what goes into the charge as opposed to whether or not Nationwide was essentially prepared to give an amount that they claimed was sufficient to restore the car to its prior condition? Why is it necessary to look – I mean, what's charged by various auto repair places takes into account cost of labor, rent, all of the things that go into essentially fixing the price of restoring the car to its original condition. Your Honor, I believe that's actually perhaps a misunderstanding about what I mean when I say labor rate. I said that I may not understand. This is not talking about the rate that's paid to the technicians. That's not the labor rate that I'm talking about when I'm saying there's a disagreement about the labor rate. The labor rate is what is the labor rate that Nationwide and Progressive in these cases, or just the customers generally, pay with respect – pay to the shop for the operations. So, yes, the standard is that you're required to pay the amount necessary to put the vehicle back to pre-accident condition. But in our – the evidence that we put forward where we're saying they failed to do that in this case, for the ease of the court, we broke it down and said, look, let me detail for you why we think that they failed to pay a sufficient amount. And there are four categories. We think they failed to pay a sufficient amount for parts. We think they failed to pay sufficient amounts for painting. A sufficient amount for what purpose? So that a certain profit could be made or by the particular – by your client or the amount that would have been sufficient to restore the car to its prior status before the accident? Your Honor, if you look at – a cost is – the cost that's necessary to do that is the result of market forces, right, in part. They claim that there were – they could point to the insured or – in one of the categories, the party whose car was damaged by a nationwide holder. They claim that there were repair shops in the area that could do it for less. And so I'm trying to understand. So you don't – so you say that in their calculations of what they want to pay, they're giving out enough money for hourly – what it costs for hourly rate. But that's not their problem. That's – I'm not sympathetic, but that's not – that's basically not their problem. If they could – if they say we can point to – we can direct you to where you can repair this car and have it placed in its pre-accident condition in other places for what we are prepared to pay, what's wrong with that? Well, respectfully, Your Honor, there's a few things wrong with that. First, the assertion that they have other shops that will do it, as you said, at this total cost, they actually haven't put in any evidence of that. And, in fact, their adjusters themselves said that if those cars were taken to that supposed other shop, they would still have the right to ask for amounts above progressive and nationwide estimates with respect to additional operations. All right? None of those people have even done it. But that's – that's a little – to go, I think, to the – There's a further problem with the procedure here that's conducted by the judge, which is that the judge faulted your client for failure to put forth evidence showing in individual cases that the car was being repaired for – was being – was commanding too little money from the insurance company. But the obligation of a movement for summary judgment is to demonstrate in the first instance that it is entitled to judgment. And in order to show entitlement to judgment, the insurer had to show, progressive in this case, that it was offering progressive – it was offering prevailing rates. It seems to me from looking at the record that that's not what they showed at all because if you look at the way they constructed their guide that governed the amount that they would pay for labor, it says – and I'm quoting from the guide. This is CA-62. It says, when to review labor rates. Generally, only review labor rates within a geographic region when you are not reaching agreed rates on a regular basis or at a minimum on some periodic basis. And so – and further down, it says that when reviewing labor rates, do market research of rates that shops are accepting within the region. So what they are saying is because we prevail upon garages to repair at this labor rate rather than sue us, that's the prevailing labor rate. Well, that's not necessarily the prevailing labor rate. The fact that an insurer, with all its market power, can prevail upon a garage to accept rather than sue, and who's going to sue for $300 or a difference of $400? They're saying the rate that we can get garages to agree to satisfies our obligation. And that seems to me not to have borne their burden to show in the first instance that they have shown that they are offering prevailing labor rates. Your Honor, I think you understand very well my argument and have said it, I think, better than I could say myself. And I would even simply add to that with respect to the issue of why this is actually a deceptive practice. And I think if you put these two things side by side, it helps to understand this. The method of writing the appraisals systematically under-reports the true labor rate paid. So what we have is a system of – and the nationwide and progressive are intentionally introducing inaccurate data into the stream of information available within the industry. Then they go back and they rely on that industry data to say, hey, look, this rate is the prevailing rate in the marketplace. So it's a garbage in, garbage out type of scenario. So you can have that argument with respect to progressive. And I know that these are tandem cases, but you're arguing this to both right now. Do you have something similar with respect to nationwide? Yes, Your Honor. Mr. Bollinger, their designated representative, said that he admitted in his deposition that his adjusters were padding the labor hours allowed because the labor rate was too low. And this was at CA807. And so what he's saying there is, look, because we don't want to change the labor rate that's in the summary section on the estimate, we are going to have our adjusters because we don't let them do that and we don't want them to do that. They're going to allow extra hours. It should only take an hour to do that, but we're going to allow an hour and a half because that ups the total cost of the estimate. But both of these insurers have talked about the fact that both looking through subrogation, insurers look at subrogation data. What are other insurers paying, right? Which, by the way, doesn't tell them. CA807? That's what I have in my notes, yes, Your Honor. Sorry, can I just understand, are we, is this the argument in both the progressive case and the nationwide case or are they being handled separately or are they both going on? She wants to argue both. Oh, okay. I was only allowed 15 minutes. I'm going to give you more time, but as I understand it, you want to argue. Correct. I'd like to add, along the lines I was saying before, is the answer to what Judge Corman was asking. Judge Corman was essentially saying, if they come and they show, we can get the car repaired at this price, why doesn't that satisfy it? And the answer, it seems to me, is that what the insurance company is required to pay is not a rate that the insurance company can use its muscle to get the car repaired for, but the prevailing labor rate. And prevailing labor rate surely encompasses, or it seems to me ought to encompass, what a customer, if a customer walks into a garage, a one-car owner, a two-car owner, my car is damaged, what will you repair it for? Well, here's what we charge so much. This is our labor rate. This is what we'll charge you. That's at least a part of prevailing labor rate. And the fact that the insurance company has shown they can get it repaired for less doesn't make that the repair of the prevailing labor rate. Yes, Your Honor, I think that is absolutely correct. And I would also say that where the insurer is asking the customer to pay the difference out of pocket, the effect of that is to allow indirect steering. And I want to be clear, because you'll probably hear it, we have not made a steering claim. These people came to us, we're not saying they were steered otherwise, and if they tried it, it wasn't successful. But what I'm talking about is not a claim on our part, but the effect of a standard that the Nationwide and Progressive have asked the court to adopt. And that is to say, if a customer has to pay out of pocket, even if that repair shop's charges are reasonable, then effectively what you're doing in the industry as a whole is you're moving, you're steering customers away. New York has made a legislative choice that that's not what they want to have happen. Therefore, the interpretation of the obligation in this case needs to be done, interpreted consistent with that policy statement under New York law. Now, in the Nationwide case, as to Nationwide, there are additional arguments. Well, first of all, as to both cases, I think it is the case that the evidence showed that in numerous cases the insurer was throwing in extra, so that the labor rate that was being accepted was not really what was governing the transaction because the insurance company was throwing in some extra in an unspecified manner. But passing that, there are two additional arguments that you have with respect to the Nationwide case. There's one, a very significant procedural one, which is that you never had notice that you were defending the labor rate. I think the motion was made on a completely different basis, and the district court, without ever giving you notice that you had to defend on the labor rate basis, then went into an analysis similar to the analysis in the Progressive case to decide the case against you. I think as a procedural matter, you were simply—a judge is not allowed to do that. But then, in addition, with respect to Nationwide, the Nationwide case was based on the affidavit of Reynolds. It's Reynolds. Is that right? Reynolds' affidavit? Yes, and I would just alert—there are two Reynolds. There's an Alan Reynolds, who's management, and Kevin Reynolds, who was an appraiser. Well, I'm talking about the Reynolds whose affidavit was used in order to show that the Nationwide— This is Alan Reynolds. And in the Nationwide case, the standard was a little bit different. It was not prevailing rates, but it was cash value, which is defined by the New York law to be—what's the standard under the New York law? Actual cash value. The actual cash value. That is defined to mean what the customer—what the claimant can reasonably expect to get the car repaired for. And all the testimony of Reynolds was not what a customer can reasonably expect to get the car repaired for. It was entirely about what we can get the car repaired for. And there again, it simply failed to address the standard that—the evidence failed to address the standard that the insurance company is required to meet. Yes, I agree, Your Honor. I believe that all of that is correct. And the procedural portion that you noticed, I think you can see a difference in the record, and that was in no small part due to that fact with respect to the breach of contract, not knowing that they were moving or that we were expected to defend the part that we had stipulated to was for the trier of fact. Your Honors, if you have no other questions, I will conclude my argument subject to rebuttal. Thank you very much. We'll hear from Progressive, please. And we'll also give you a little bit more time. Good morning, Your Honors. My name is Kimberly Kochis, and I'm representing Progressive Appellees in this case. This case isn't about consumer protection. This is a business-to-business dispute about an insurance company and an auto body repair shop that wants to be paid more for auto body repairs than Progressive. So if Progressive is providing, and I guess Nationwide, but if the rates are not actually reflective of the actual payments that are made ultimately, how can they be the prevailing competitive rates, or how can they be part of a good-faith negotiation with an escarrage in this case? If you're asking how can the actual line items rates, when you're negotiating the repair as a whole, be part of a breach of contract claim, when it's really the two, the Progressive and the Nick's Body Shop, that's actually negotiating the contract as a whole? You are using these rates, and as I understand it, the rates are one thing, but the reality is that you're paying a little bit more.  Over time, certainly over the relevant time, between 2007-2012, and so the rates don't reflect the reality. The prevailing rate that you use don't reflect the reality. Is that exactly right? Well, no. The rate that Progressive uses is the customary, ordinary rate that's in that geographic area, and Progressive has a set practice as to how it determines what that prevailing competitive labor rate is in that geographic area. Progressive put forth evidence that shows that not only does it have that process, that Progressive follows that process. Well, now, page 62, CA62, that's from your guide, and that tells how the rate is established. Correct. It says, don't look at the rate. Don't look at reviewing the rates. First of all, I'm not aware that you put in any evidence as to how those rates were initially established. What sort of research was the research that resulted in those rates that are in the guide? But then, as time goes by and things change, your guide explicitly says, do not review the labor rates with a view to raising them unless you are not reaching agreed rates on a regular basis or at a minimum on some periodic basis. As long as garages are accepting, that's the rate that your guide governs. Now, that's got nothing to do with what a customer who walks into a repair shop off the street and says, what will you repair this for? That's not the rate they're going to quote him. Well, actually, that's right, Your Honor. Nix actually quotes a much lower rate than it's posted labor rate when it's customers off the street or if it's customers that has a contract. I have no idea what the truth is with respect – I have no idea and no bias as to what the truth is with respect to labor. The point I'm making is that your paper submitted to the court on summary judgment, where you had the burden of showing that you were entitled to judgment and there was no issue unless the plaintiff would subsequently raise one of disputed fact. You did not show prevailing labor rates. You showed rates that you can get the car repaired for because you will come to a garage and say, as you came to Nix, and say, okay, this is what we'll give you. Are you going to accept it or are you going to sue us? And obviously, almost every garage is going to accept it unless they just can't get anything out of it. So I don't think you put forth a demonstration that you were offering prevailing labor rates. I think it would be helpful to step back and apply the labor rate reference guide as we did in summary judgment. Labor rate reference guide sets forth progressive policy for when a labor rate review is conducted. And the labor rate reference guide, which your Honor was referring to, was in place during the entire statute of limitations. During that period, there were two reviews that took place in the Syracuse area, which governed the rates. As part of that process, what progressive does is it collects data from three different sources. It collects data from local body shops as to what they're charging. It collects data from subrogation, which shows not only what other insurance companies are negotiating with body shops, but what other body shops are accepting. And it also used industry data from various vendors, which contained both insurance information and body shop information. All of that data is then put together in a labor rate review, which we submitted to the court as well. And that information is analyzed by the managers in the Syracuse area and then sent to a director in Cleveland to review. And at that time, if an adjustment is necessary, then progressive will increase. That's why you say on CA62, if we find we are not able to reach an agreed price, that indicates to us that we may need to review and or adjust our rates, which we do on a regular basis. That's correct. Adjusters are having daily negotiations with body shops, and the managers are talking to those adjusters on a daily basis. When the managers are hearing that there's body shops that are requesting a higher labor rate, then at that point, that's when the labor rate review process starts. And like I said, it's happened twice during the time period issue here. Yeah, but the point is that for a body shop to refuse your labor rate and say, no, I'm going to sue you, that's just uneconomical. You occupy such a dominant position as the insurer. A garage can't, as an economic matter, sue you because you're giving them $200 too little or $300 too little on a repair job. And so what we can get shops to accept is a different proposition from what the prevailing labor rate is, which includes what customers will get, people who walk in off the street to the repair shop, what they will be quoted and what they will be allowed as a labor rate. I just think that it may be that in the end, you're absolutely right. It may be that when this case is tried, that your rates will be fine. But the question is, have you demonstrated to the district court that you were giving prevailing labor rates? And I simply don't see that. It may turn out that that will be what a fact finder would find. But how have you shown it? I think it's important to note that Progressive's policy is very specific with respect to the labor rate. It pays under its policy. And Progressive's policy specifically states that it pays the prevailing competitive labor rate as determined by Progressive. And what the district court did is the district court looked at our process, saw that we followed our process, and determined it was a reasonable process, which shifted the burden to NICS. And NICS couldn't create an issue of fact to show that the rate that we charged wasn't unfair, that it wasn't reasonable. And that's why the district court's opinion was correct. But even if you disagree that the labor rate process was competitive, it wasn't deceptive. The labor rate that Progressive paid was disclosed at the time it wrote its initial estimate and given to NICS before the vehicles were carried. That's right. That's right, Your Honor. With respect to 349, there's no deceptive conduct here. Progressive disclosed in its policy that it was going to pay the prevailing labor rate as determined by Progressive. And it disclosed in its estimate the labor rate it was going to pay before NICS began repairing the vehicles. So there's no deception here. It's not in dealing with the repair shop. It's the claim, it seems to me, is one that involves the terms of the policy as they're presented to customers who buy the policy. Because the policy says, we're going to pay prevailing labor rates. And if what is being done is not paying prevailing labor rates but paying rates that the insurer can effectively command by using its market power and the improbability that a repair shop will sue or refuse to agree over a couple of hundred dollars, two, three hundred dollars, then you are using a scheme in which you're essentially promising one thing and giving less. And I don't know why that doesn't qualify as a—it may not be true. It may be that you're doing it all fine. But this is summary judgment in which the district court says there's no issue of fact. And it seems to me there is an issue of fact as to whether you are representing through the terms of the contracts that you're offering that you're going to pay something when you know perfectly well you're not. You're going to pay less. You're going to pay what you can force down the throats of the marketplace. This isn't about Progressive forcing a labor rate down the throats of anybody's shops. That's why Progressive gets data from different sources. It's not just Progressive's data. I have no idea. But what you have shown is that you regard as prevailing labor rates what you can get the shops to settle for. Progressive determines its competitive prevailing labor rate by using a process which collects data from three different sources. It's not just what Progressive's estimates are written as. It's from three different sources, which it then analyzes and then reviews in order to determine whether or not the labor rate is reasonable. And I take it that you're saying that it was not deceptive to Nick's Garage. There may be some other misunderstandings or what customers, that is insured, may regard as a deception, but as to Nick's Garage, it was not deceptive. Well, here, Your Honor, Nick's is standing in the shoes of the assigners, so it has no greater rights or less rights than the assigners themselves. So when it was negotiating with Progressive, it was negotiating as a designated representative, and it was standing in the shoes of the assigners. So when Progressive made its disclosures, there was no deception to the assigners. It's irrelevant whether it's deceptive to Nick's Garage because Nick's Garage is suing on behalf of the customer who bought the policy. Right, but he's standing in the shoes of the assigners. So when we are negotiating the labor rate, he's negotiating on behalf of the assigner, and we are speaking to the assigner through Nick's. That's correct. But even if you found the conduct was deceptive, there's still no independent injury distinct from— independent 349 injury distinct from the breach of contract injury. It's just monetary damages here, which is very different. What about the further thing about the extra money that was frequently thrown in in the deals that were concluded, the agreement with the repair shops? There was often extra money given by the insurer over and above the money that was allocated or extra hours put in over and above what was said to be the prevailing labor rate, so that in fact you were giving more than what you were saying was the labor rate, but you're saying this is the prevailing labor rate. No, Your Honor. We weren't giving more with respect to the labor rate. What we were doing was negotiating in good faith. As Your Honor pointed out— You were giving more money. We were giving them more money as part of an overall negotiation about the cost of repairing that vehicle. When we write our initial estimate, Nick then reviews that estimate. You say all these instances, there are many instances in which garages agreed to our labor rate because we reached agreement with them. But the agreement, although it said that that was the labor rate you were giving, threw in extra money. So how can you say that the garages agreed to that labor rate and that validates the labor rate when the garage was being given extra money to reach agreement? Your Honor, in Progress' case, the garages weren't given extra money. Here, what it was was a negotiation about things like labor hours or OEM versus non-OEM parts or paint materials. And those are all items that Progressive regularly negotiates with Nick's and with everybody's shop. What you are saying is that the New York State insurance laws require you to negotiate in good faith, so you can't just say, no, we're not going to pay you because this is our prevailing rate. We'll consider it. That's correct, Your Honor. It's a give and take. I'm not saying there was bad faith in giving them extra money. I'm saying if you give them extra money, you can't then say they agreed to this labor rate. It's not about giving them extra money for the labor rate. It's about different processes and procedures, which then the body shop says requires more time. We don't know what it is. It's extra money that they got. And you validate the labor rate here. You validate the labor rate by the fact that you reached agreement with all these garages. Actually, here we do know what Progressive paid in addition to, because here the process and the record shows is that Progressive would submit an initial estimate. Nick's would then write a notice of deficiency, which contained additional line items. And then Progressive would supplement once, twice, sometimes four, five times. And so you actually, if you compare every line item, you can see where Progressive has said, okay, you're right. We'll pay you an additional .5 to repair a quarter panel. So here it's very clear that it's not additional money for labor rate. It's not a labor rate type concession. What it is is it's additional hours, or it's an OEM versus a non-OEM part. Thank you very much. Thank you. We'll hear from Nishiwai. Good morning, Your Honors. Roy Mura for the Nationwide Appellees. Your Honor, I understand why for judicial economy the court wanted to hero our argument on both cases together. But I believe it's critically important, especially to my clients, that the court understand the important distinctions between progressive stance or position, contractual position at motion and nationwide. I understand the differences. Why don't you lay those out? And the primary difference, Judge LaValle, here is that the nationwide policy does not use and does not contractually promise that nationwide will pay prevailing competitive rates. But the nationwide policy promises, as Judge LaValle, you correctly pointed out, through the interpretation of the regulation, is that nationwide will pay actual cash value, which is defined as the lesser to include what a claimant, and that would be the policyholder, the third-party claimant, can be reasonably expected to repair the property to its condition immediately prior to the loss. That's what we've heard about, the pre-accident condition sufficient payment. And so when we're talking about burden of proof and whether or not the move-in carried the burden of proof, I encourage the court to look closely at the nationwide record, the Nix v. Nationwide record, which I respectfully submit does indicate or does include nationwide having carried its burden of demonstrating as a matter of law that the payments that Nationwide made, even though disputed by Nix to be sufficient for Nix purposes, as Judge Corman pointed out, what's the sufficiency? Is it sufficient to repair the car or is it sufficient to make Nix Garage enough profit that Mike Orso testified was the basis that he calculated the labor rates of his business? And Nationwide, in submitting the declaration of Allen Rentals, which, Judge LaValle, you pointed to, and actually the deposition testimony of Kevin Rentals, one of the material damage appraisers that came in actually in opposition papers from Appellant's Counsel, demonstrated that the payments that Nationwide made were, in Nationwide's position or belief, sufficient to repair all the 18 vehicles, 19 repairs, 18 vehicles to pre-accident condition. At that point in time, and I'll get to the notice issue in just a moment, Your Honor, at that point in time the burden shifted to Nix to controvert that Nationwide had underpaid, had not paid enough to restore the vehicle. It only shifts if Nationwide has sustained its burden of showing its entitled judgment, meaning that the rates it has offered are the rates that a claimant would reasonably be expected to get. I forget when you stated that. Reasonably expected to be able to repair the property to its condition immediately prior to the accident. That's right, Your Honor. And you alluded to the declaration of Allen Rentals, and I went during the earlier argument and I looked at what Allen Rentals says, and what he says is not that, yes, he does say Nationwide had these other shops that would have or could have done the repairs for what Nationwide paid, but the point is it's clearly not that Nationwide would have done the repairs or had the repairs done for the policyholders and the third-party claimants, but that the people who own the car would have been able to go to these shops. So that's the claimant reasonably being expected for the monies that Nationwide paid, for the amounts it estimated, for the monies it paid, go to these other shops and have those vehicles restored to pre-accident condition. That is what Nationwide established on its motion for summary judgment. We can get you a shop that will repair it for that price. Reasonably be expected to repair to pre-accident condition. The actual cash value requirement is met. The standard of the contract is not what a claimant with the muscle of the insurance company behind you can expect to get the repair for. It's what a claimant can reasonably expect to get the car repaired for, and that's not the same thing as what when Nationwide comes in and says, okay, you go to this shop and you'll have no problem. You'll get it repaired at that price. Of course the shop is going to do it. But you see it—I'm sorry to interrupt, Your Honor. I'm sorry. At a price at which they can make some profit. They want Nationwide's business because that's huge business. But respectfully, I think it is. I respectfully disagree with you. I believe that it is one and the same. The purpose of a notice of rights letter, and the district court correctly noted that we have those two Office of General Counsel opinion letters out there that predated or actually were issued in and around the same time frame of 2007 to 2012, and those opinion letters say things like the first one said that if the insurer elects to repair the vehicle at the higher costing, the shop that charges more, the insurer is not. The insurance company is not financially responsible to increase its offer under the precepts of Regulation 64. That's the first point. The second one, which dovetails with that, is that with respect to the concept of, oh, the deceptive act or practice of Nationwide is refusing to negotiate, that's the allegation or the accusation, this disconnect between it saying, you know, here's the labor rate we allow and that's it, is that the, again, that insurance department came out and said there's no requirement that either side move off its initial numbers or initial offer implying that it was not a violation of Regulation 64 not to do so. Now, that relates somewhat to the general business law issue. I read the Reynolds affidavit quite carefully. I didn't see anything in it that addresses the rates that will be offered to a claimant who, without the intervention of an insurance company, comes and says, what will you repair my car for? And again and again he says, for example, and this is on page 854, that at our rate, the rate that we are offering was the hourly body and finished labor rate accepted by all auto commission repair shops in Syracuse, except the plaintiff and one other. But that means that they accept them when we come in and say, this is what we're going to give you, they accept it. It doesn't even address what a claimant who does not have the muscle of the insurance company behind him can get the car repaired for. So I just don't see how the Reynolds affidavit, how you met the standard of showing that your rates were the rates that were called for by the insurance contract. The Reynolds declaration states on page 855, nationwide head backup collision repair shops willing to repair and restore the 19 vehicles that issue, it's 18 vehicles that issue, to pre-accident condition in return for the payment that Nationwide made, and the amount set forth on the Nationwide estimates. Now, I don't know how more clear the Reynolds declaration could be that there are these other shops. It's very clear that Nationwide can get the car repaired for that. No, no. Well, Nationwide could get. In other words, that these vehicles could be taken to other shops within the Syracuse marketplace but to, and have their vehicles repaired to pre-accident condition for the amounts that Nationwide estimated and paid. That is, respectfully. Is there any evidence that Nationwide tried to collect data from repair shops in the area with which Nationwide did not have any agreements? Yes, Your Honor. That is in the record. I don't have a record citation. Where is that? I believe it's in the joint appendix, Your Honor. Could you provide us with insight to that? It's not at my fingertips, but I believe that the testimony of Bud Bollinger also indicated that there was surveying both of the Nationwide in-program shops as well as the out-of-program shops. Can I ask, again, with respect to the excellent point that Judge LaValle made? Since we're talking about a contract between the car owner and the insurance company, why should it matter to the owner of the car how the rate is determined? In other words, if I were the owner of a car and I just wanted to get the money for the repair and not really repair the car, which is something that we actually did once about 20 years ago, then I could see how it would matter to the owner of the car. But why should it matter if they actually wanted to get a repair, that somehow through the exercise of its bargaining power, the insurance company could get it repaired for a lesser rate? We're basically dealing with an assignee or assignee difference here. Well, number one, I don't think it should matter as long as the vehicle is repaired to its pre-accident condition. I'm wondering why it should matter to the automobile owner. I can understand why it may matter to NICS, but NICS doesn't have any more interest in this than the automobile owner. The automobile owner has gotten his car repaired, arguably for an amount that let's assume that this was as a result of the exercise of the bargaining power of the insurance company. But from the standpoint of the consumer, why does the consumer care that through the exercise of the bargaining power of his insurance company, they got it repaired for less? I don't know why the consumer would care, Your Honor. But the consumer might very well care in that the consumer might have more confidence in the quality of the work of the shop that he's selected rather than the quality of the work that he's required to accept otherwise. That's correct, Your Honor. But that goes to quality of work, not amount of rate, as I understand. If the consumer says, I trust my mechanic at this shop, and I want the car repaired there, but the consumer is required in that case to accept a condition in which the consumer will be liable for the excess over what the shop fails to collect from the insurer. That's correct. Unless the consumer is going to say, okay, I'm going to go to whatever shop you agree to, the consumer is in a position in which the consumer will have to accept unless the shop chosen by the consumer is going to knuckle under and say, okay, I'll accept. The customer is going to have to go to the shop that is designated by nationwide. Because that's what the policy requires, and that's what the regulation requires. That's right, Your Honor. The consumer will have to accept that. That's what the policy requires if the rate is the rate that a customer can reasonably expect to get the car repaired for. It's a pre-accident condition, which in this case, nationwide demonstrated, could have been done in all 19 repairs. And in this case, instead of, and on the issue very, very briefly of notice, Your Honor, which you brought up as being a significant issue or a problem, I think, as you put it, of something the district court respectfully. Initially, we respectfully submit that the district court really didn't grant the summary judgment on the breach of contract on different grounds. Because one of Nationwide's argument was that the NICS had not been injured because the S ignores had not been injured. And intrinsic to that argument was the fact that the vehicles had been repaired for Nationwide's payment to pre-accident condition. And in recognition of that, both the appellant's NICS memorandum of law in opposition to Nationwide's motion. And as noted by the district court in its decision pointed out, this, it's on page SPA, it's special appendix page 11. It's page 11 of the district court's decision. In response to the motion, plaintiff contends it has both lay and expert evidence that defendant did not pay the reasonable cost of repairing the vehicles to pre-accident condition. And yet absent from the submissions or the record. Although that was a contention, there was no actual evidence put in either from the principal Michael Orso or anywhere else by NICS that actually Nationwide's, and controverting Nationwide's movements position that the payments were sufficient to restore the vehicle to pre-accident condition. Can I ask you another question? Please. I just want to pick up on Judge LaValle's point that the consumer, the customer whose car is damaged might want to go to NICS. And this would prevent him or her from going to NICS. Let me just finish the question before you shake your head no. I'm sorry. Taking into account, again, that we're dealing with an assignee relationship. Did any of the car owners here complain? Is there any indication that they made this argument that we really wanted NICS but we went to Joe's because that was what the insurance company made us do? No, Your Honor. And you think if there had been any complaints to NICS that NICS would have put in some evidence of that via any affidavits or declarations of the policyholders or third-party assignors. And yet the record is bare of any such indication either that the consumers or the vehicle owners complained about. NICS did not charge them the excess over what NICS wanted to charge. NICS did not bill the customers as it was entitled to do with its contract with the customers. It didn't bill them for the excess. I believe more exactly, Your Honor. NICS did charge or bill them but then say or indicate that they were not going to pursue collection of those overcharges. They didn't get charged. They didn't get – the overcharges were not collected. As far as we're having this litigation is they're going after you. Your Honor, if I may, and I know my time is long elapsed. You've got 30 seconds. All right. Just briefly I want to touch on the general business law issue because it is an important issue to the industry. This court in Convoy and Broder held that a plaintiff cannot circumvent the right of – excuse me – the lack of a private right of action for violation of New York State law by pleading the claim within the environment or the parameters of general business law 349. Excuse me. That is exactly, nationwide contends, what's going on here. The district court correctly noted that this is not a case where there are independent claims, common law claims of tort outside the parameters of 2601 and general business law 349. And on that basis, her ruling, respectfully, we submit was exactly correct and in line with this court's decisions in Convoy and Broder. Secondly, with respect to the deceptive matter, there is a case not cited in our brief. If I ask the court to take attention or take note of it, it's the New York Court of Appeals case in Schlesinger v. Valspar, V-A-L-S-P-A-R. It's a 21NY3D166. It's a 2013 case in which the New York Court of Appeals held that mere illegal or alleged illegal behavior by a business is not in and of itself enough to constitute a deceptive act of praxis for purposes of 349. And so, therefore, on the basis of that case, we respectfully submit that whatever NICS contends as being nationwide dishonest or disingenuous conduct does not in and of itself rise to the level of something actionable under 349 unless someone, whether it was the original vehicle owner or NICS, was deceived, and on the record in this case, neither was the case. Thank you, Your Honor. Thank you. Ms. Cannon? If I may start at the end, just correct a couple of things, especially with respect to the record. The suggestion that NICS didn't charge the customers. In fact, not only did NICS issue the final bill and charge the customers, the only reason they're not pursuing the collection against the customers or that they didn't expect those customers to pay is because they got this assignment, right? And so it was a fair bargain for consideration. We will not collect against you so long as you give us the right to collect directly against the insurer because, frankly, that's who would have to be paying for it anyway in these particular circumstances. An assignment doesn't destroy the claim. Those customers still had the claim against the insurer under GBL 349. They had the claim because they went to NICS and NICS said, presumably, we want X amount. And NICS said that, you know, you don't have to pay it. Why doesn't that indicate that NICS was something special to these people as opposed to some store across the street? Your Honor, in the progressive, we actually do have, I believe, nine affidavits from customers who say that they wanted to have NICS done. They wanted to go to NICS because they trusted the quality of the repair. So on that record, we do have the affirmative evidence that says we liked NICS. NICS has quality workmanship. The argument that the vehicles had been repaired and, therefore, there was no injury and that somehow that's sufficient, basically, they're saying if we paid $10 and the shop went through with the repairs, that that would be sufficient. I mean, first of all, it's not even standard because under New York insurance law and these contracts, it's clear the customer didn't even have to get the car repaired to be entitled to the money. They're not allowed. They are prohibited by New York law from requiring the customer to get the car repaired. So whether or not the car got repaired is completely not helpful. No, I understand that. That was the point of my question. It was part of it was that I could understand a complaint by a customer who said, I'm going to keep the money that somehow the amount that they're giving me is not enough. But that's not this case, I'm assuming. That's not this case only because NICS said, look, we are in a better position to we will do this for you, right? Any individual consumer, any individual consumer has such a small claim, it's not going to be worth it for them to take it to the insurer. But they did owe that money to NICS and absent NICS saying, let us take this and pursue this for you, they would have been required to pay that, right? So they do still have that claim. Now, GBL. It would have been required. Before NICS getting the assignment against the insurer, the customer would have been billed for more. Correct. Would have been liable to be billed for more, which the customer might not have liked. And I would just tweak that a little bit. They were actually billed, and there is in the record final invoices for the full amounts of the charges, as well as the repair contract, which has a specific provision that says no matter what your insurer pays us, you're liable for the full amount of our charges. And NICS did have that in their contract. But the reality, and I would assume that the reality in the real world is that if they could have gone somewhere else and gotten it for less, they might have. I don't think that's true, Your Honor, actually. They would have actually paid more. If you look at the affidavits of the customers, I think you'll see why. I mean, this is a business that's been there since 1954. There's a lot of people in this greater Syracuse area that have a great deal of trust for this particular business, and they do quality work. When I first moved to the area, that's what I was told. Go to NICS. They're the people who do the best work, and they've got integrity. So I respectfully would say we have affidavits from nine customers supporting that, and I don't think that that is necessarily the case. Thank you, Your Honors. Thank you. We'll reserve the decision.